UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------- x

JAYLEEN HERRERA,                          :
                                          :        REPORT AND
                              Plaintiff,  :        RECOMMENDATION
                                          :
        -against-                         :        20-CV-4284 (FB)(PK)
                                          :
BOSTON MARKET CORPORATION,                :
                                          :
                              Defendant.  :

----------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

Jayleen Herrera ("Plaintiff") brought this action against Boston Market Corporation ("Defendant" or "Boston Market") for discrimination on the basis of gender and for retaliation. ("Compl.," Dkt. 1), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) (the "PDA"), the New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-502(a) *et seq.* ("NYCHRL"). (Compl. ¶ 1.)

Plaintiff's Second Motion for Default Judgment ("Motion," Dkt. 38) has been referred to me for a report and recommendation. For the reasons stated herein, I respectfully recommend that the Motion be granted in part, as set forth below.

## BACKGROUND

### I.        Factual Background

The following facts are taken from Plaintiff's Declaration ("Decl.," Dkt. 39-7), Affidavit ("Aff.," Dkt. 41), and deposition transcript ("Herrera Tr.," Dkt. 39-9) and are accepted as true for purposes of the Motion. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (in light of defendant's default, a court is required to accept all of plaintiff's factual allegations as true and draw all reasonable

inferences in its favor).

In March 2019, Plaintiff began working for Defendant as a cashier and was paid $15 per hour five days per week for about thirty hours per week. (Decl. ¶¶ 3, 6.) Ninfa Bautista ("Bautista") served as Defendant's General Manager and supervised Plaintiff throughout her employment. (*See id.* ¶ 9.)

In mid-September 2019, after noticing that Plaintiff was using the bathroom frequently, Bautista asked Plaintiff if she was pregnant. When Plaintiff responded that she was, Bautista appeared upset. (*Id.* ¶¶ 9-10.) Bautista told Plaintiff, "You should have kept your legs closed. You have a baby already and now you have another one coming. You're so stupid!" (*Id.* ¶ 11.) In late September, Bautista stated to Plaintiff's coworker, "She's only 20. She has a baby already. She's so stupid." (*Id.* ¶ 13.) Bautista's comments made Plaintiff feel "extremely humiliated" and "uncomfortable, embarrassed, and offended." (*Id.* ¶¶ 12, 14.)

On September 23 and 26, 2019, Bautista assigned Plaintiff to work shifts on days when Plaintiff had previously explained she could not work because she had to attend school. (*Id.* ¶ 15; Herrera Tr. at 170:8-19.) On September 28, 2019, Plaintiff did not appear at work due to a domestic violence incident. That same day, Bautista took Plaintiff completely off the work schedule, effectively terminating her. (Decl. ¶¶ 16-17.) Bautista told one of Plaintiff's co-workers that Plaintiff had been fired. (*Id.* ¶¶ 21, 23.) Plaintiff alleges that around this time, non-pregnant employees who missed work with little advance warning or who failed to appear at work on time were not even reprimanded. (*Id.* ¶ 20.) Plaintiff tried to contact Bautista to discuss her removal from the work schedule and explain her absence on September 28, but Bautista hung up and ignored her subsequent calls. (*Id.* ¶ 22.)

On October 2 and 3, 2019, respectively, Plaintiff complained about Bautista's conduct to area manager Andy Tricouros ("Tricouros") and human resources representative Doug Kramer ("Kramer"). (*Id.* ¶¶ 25-27.) Kramer informed Plaintiff that he would investigate. (*Id.* ¶ 30.)

On October 10, 2019, Plaintiff visited the restaurant to speak with Bautista about her need for

a job.  (*Id.* ¶ 31.)  Bautista told Plaintiff that she was unable to put Plaintiff back on the schedule because she had hired new employees.  (*Id.* ¶ 33.)  Some of these newly hired employees were not pregnant.  (*Id.* ¶ 39.)  Plaintiff told Tricouros, who was also present, about Bautista's comments related to her pregnancy and being taken off the work schedule without warning.  (*Id.* ¶ 34.)  Tricouros told Bautista to rehire Plaintiff.  (*Id.* ¶ 35; Herrera Tr. 138:4-15.)

On October 11, 2019, Bautista placed Plaintiff back on the work schedule, but her schedule was reduced from five days per week to two or three days per week.[1]  (Decl. ¶¶ 37-38.)  Non-pregnant employees were given more shifts than Plaintiff.  (*Id.* ¶ 39.)

From November 20 to 25, 2019, Plaintiff was hospitalized for depression, anxiety, and pregnancy-related conditions.  (*Id.* ¶ 40, 42.)  When Plaintiff appeared for her shift on November 27, 2019, Bautista said she did not look okay and directed her to go home.  (*Id.* ¶¶ 43-44.)

On November 30, 2019, Plaintiff was once again left off the work schedule.  (*Id.* ¶ 45.)  Bautista told Plaintiff this was because Plaintiff had not come to work on November 27.  (*Id.* ¶ 47.)  Plaintiff reminded Bautista that she did go to work that day, but Bautista had sent her home.  (*Id.*)  Bautista did not respond.  (*Id.*)

On December 3, 2019, Plaintiff complained to Bautista about her hours, noting that they had been unfairly reduced and that she was more than able to work despite her pregnancy and recent hospitalization.  (*Id.* ¶ 48.)  On December 12, 2019, Plaintiff's work hours were further reduced.  (*Id.* ¶ 49.)

Around December 2019, Bautista made inappropriate comments to Plaintiff, including telling her "you're so slow" in front of other co-workers, making Plaintiff feel "extremely uncomfortable." Bautista did not treat non-pregnant workers similarly.  (*Id.* ¶¶ 50-51.)

---

[1] Plaintiff states in her Declaration that she was placed back on the work schedule on October 16, 2019, but in her Affidavit, she clarifies that this date was October 11, 2019.  She also provides documentation of paid hours with her Affidavit that are more consistent with the October 11, 2019 date.

Plaintiff testified that the last day she worked for Defendant was near the beginning of March 2020. (Herrera Tr. at 204:18.) Around this time, her doctors told her to stay home because she would get cramps when she walked due to her pregnancy. (*Id.* at 204:22-25.)

On March 7, 2020, Plaintiff began contacting her supervisors to obtain the paperwork necessary to go on New York State Paid Family Leave. (Decl. ¶ 52.) Despite several attempts, she received no response. (*Id.* at ¶¶ 53-56.) Plaintiff gave birth on March 27, 2020. (Herrera Tr. at 204:14.) On March 31, 2020, she texted Bautista, and Bautista finally responded with the necessary information for her to apply for leave. (Decl. ¶¶ 57-58.) The delayed response caused Plaintiff to file for New York State Paid Family Leave after she had already given birth and made her feel "extremely anxious, disturbed, humiliated, and disrespected." (*Id.*)

Plaintiff did not return to work after her maternity leave. Plaintiff states that she "felt compelled to not return to work for Defendant . . . given how hostile [her] work environment had been throughout [her] pregnancy" and, thus, she was constructively discharged. (*Id.* ¶ 59.)

Plaintiff testified at her deposition that she did want to go back to work after her maternity leave benefits ended and that she reached out to Defendant for information about the process for returning to work but received no response. (Herrera Tr. at 205:3-6, 10-12.) Because nobody told Plaintiff what to do in order to return to work, she "assumed" she had been terminated. (Herrera Tr. at 208:15-19, 209:13-18.) Plaintiff alleges that, by not adding her back to the work schedule after her maternity leave ended, Defendant "effectively terminated" her. (Decl. ¶ 60.)

## II.    Relevant Procedural Background

After submitting a claim to the Equal Employment Opportunity Commission, Plaintiff obtained a "Right to Sue" letter on July 13, 2020. (*See* Right to Sue Letter, Dkt. 1-1.) Plaintiff filed the Complaint on September 14, 2020. (Dkt. 1.)

Defendant waived service of the summons and Complaint (Dkt. 7) and filed an Answer on

November 16, 2020. (Dkt. 10.) On December 21, 2021, the parties certified that all discovery was complete (Dkt. 23), and the case was placed on the Court's trial-ready calendar.

On August 17, 2023, defense counsel, Gregory B. Reilly, filed a Motion to Withdraw as Attorney for Defendant. (Dkt. 26.) The Court granted the motion and gave Defendant time to retain new counsel. (Sept. 18, 2023 Order.) After no new counsel appeared, Plaintiff requested a Certificate of Default (Dkt. 29), which the Clerk of Court entered on December 1, 2023. (Dkt. 31.)

Plaintiff filed a motion for default judgment (Dkt. 32), but withdrew it after the Court noted that Plaintiff had failed to provide proof of mailing the motion for default judgment and supporting papers to Defendants, as required by Local Rule 55.2. (Sept. 5, 2024 Order.) Plaintiff filed the Motion on September 6, 2024, followed by an affidavit of service of the Motion on Defendant. (Dkt. 40.) On January 27, 2025, at the Court's request, Plaintiff filed a supporting affidavit regarding her pay. (Aff.)

## DISCUSSION

### I.  Default Judgment

"[T]he decision to grant a motion for default judgment is left to the sound discretion of the [district] court." *J & J Sports Prods., Inc. v. Munwakkil*, No. 17-CV-5341 (ADS)(AKT), 2019 WL 2435788, at *3 (E.D.N.Y. Feb. 25, 2019); *see also Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).

Here, Defendant initially appeared through counsel and participated in discovery. After its counsel withdrew in September 2023, however, no new counsel entered an appearance. Defendant's CEO Jay Pandya was present by telephone at the hearing on the motion to withdraw as counsel and was warned that if Defendant failed to appear through counsel, it would be found in default because a corporation may appear in the federal courts only through licensed counsel. *Rowland v. California Men's Colony*, 506 U.S. 194, 201-02 (1993). The Court granted Defendant additional time to retain

new counsel.

Defendant has not appeared through counsel or given any reason why it has been unable to do so. Accordingly, I find that Defendant's default was willful. *See, e.g.*, *McLean v. Wayside Outreach Dev. Inc.*, No. 13-CV-2963 (WFK)(VVP), 2014 WL 11350949, at *3 (E.D.N.Y. Oct. 14, 2014), *aff'd*, 624 F. App'x 44 (2d Cir. 2015) (noting that an inability to hire new counsel is not an excuse for default and that "Defendant's failure to appear with licensed counsel for over five months is evidence of willful default").

"[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." *GuideOne Specialty Mut. Ins. Co. v. Rock Cmty. Church, Inc.*, 696 F. Supp. 2d 203, 208 (E.D.N.Y. 2010). The court must determine whether the plaintiff's "allegations establish [the defendant's] liability as a matter of law." *Finkel*, 577 F.3d at 84. "[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).

In considering a motion for default judgment, a court accepts a plaintiff's "factual allegations as true and draw[s] all reasonable inferences in [the plaintiff's] favor." *Finkel*, 577 F.3d at 84. However, a default is "not considered an admission of damages." *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158. "The plaintiff bears the burden of presenting proof of damages, which may take the form of documentary evidence or detailed affidavits." *Joe Hand Promotions, Inc. v. Benitez*, No. 18-CV-06476 (ARR)(PK), 2020 WL 5519200, at *3 (E.D.N.Y. Aug. 27, 2020), *R&R adopted*, 2020 WL 5517240 (E.D.N.Y. Sept. 14, 2020).

## II.    Procedural Compliance with Local Civil Rules 7.1 and 55.2

As part of the Motion and in compliance with the Local Civil Rules, Plaintiff included a Notice of Motion (Dkt. 38), *see* Loc. Civ. Rule 7.1(a)(1); a memorandum of law in support of the Motion ("Mem.," Dkt. 39), *see* Loc. Civ. Rule 7.1(a)(2); a copy of the Clerk's Certificate of Default against

Defendant (Dkt. 39-6), *see* Loc. Civ. Rule 55.2(b)(1); a copy of the Complaint (Dkt. 39-1), *see* Loc. Civ. Rule 55.2(b)(2); waiver of service (Dkt. 39-2), *see* Loc. Civ. Rule 55.1(b)(3); Fed. R. Civ P. 4(d)(4); a proposed judgment (Dkt. 39-15), *see* Loc. Civ. Rule 55.2(b)(3); and proof of mailing the Motion papers to Defendant at its last known address (Dkt. 40), *see* Loc. Civ. Rule 55.2(c). Compliance with the Local Civil Rules is, thus, satisfied.

## III.    Discrimination

Plaintiff seeks default judgment for sex-based discrimination under Title VII (Claim I), the NYSHRL (Claim III), and the NYCHRL (Claim V).

### A.    *Title VII and the NYSHRL*

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). Similarly, the NYSHRL provides that "[i]t shall be an unlawful discriminatory practice [f]or an employer . . . because of an individual's . . . sex . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(3-a).

"[C]laims under the NYSHRL are analyzed identically to claims under . . . Title VII, [and] the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII." *Smith v. Xerox Corp.*, 196 F. 3d 358, 372 n.1 (2d Cir. 1999) (citation omitted); *see also Joseph v. Owens & Minor Distrib. Inc.*, 5 F. Supp. 3d 295, 307–15 (E.D.N.Y. 2014), *aff'd*, 595 F. Appx 29 (2d Cir. 2015) (collecting cases analyzing Title VII and NYSHRL claims identically).

In analyzing discrimination claims under Title VII and the NYSHRL, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, an employee must first establish a *prima facie* case of discrimination. *Id.* at 802. Once a

*prima facie* case is established, the burden shifts to the employer to articulate a non-discriminatory reason for the employment decision. *Id.* at 802-03.

To establish a *prima facie* case of discrimination, Plaintiff must demonstrate that she "(1) was within a protected class; (2) was qualified for [her] position; (3) was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Green v. Town of E. Haven*, 952 F.3d 394, 401 (2d Cir. 2020) (quoting *Green v. E. Haven Police Dep't*, No. 16-CV-321, 2017 WL 6498144, at *6 (D. Conn. Dec. 19, 2017)). The plaintiff's burden in doing so is "*de minimis.*" *Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 126 (E.D.N.Y. 2011).

### 1.   Protected Class

Plaintiff is a woman who was pregnant at the time of the alleged discrimination and was, therefore, a member of a protected class. *Young v. United Parcel Serv. Inc.*, 575 U.S. 206, 210 (2015) ("The Pregnancy Discrimination Act makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy").

### 2.   Qualified for the Position

To satisfy the second element, a "plaintiff need make only a minimal showing of qualification, that is, that she possesses the basic skills necessary for performance of [the] job." *Briggs*, 819 F. Supp. 2d at 127 (internal quotation marks omitted) (alteration in original) (quoting *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991). "The employee need not show that she was a perfect or even an average employee . . . ." *Id.* A plaintiff "need only show that [her] performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge [her]." *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978).

Plaintiff sufficiently alleges that she had the basic skills necessary to merit continued employment. Before Bautista found out that Plaintiff was pregnant, Plaintiff had worked for Defendant for more than six months, and she had never received any write ups for breaching

8

employee protocols or other disciplinary action. (Compl. ¶ 12; Decl. ¶ 5.) *See, e.g., Santiago v. Crown Heights Ctr. for Nursing & Rehab.*, 15-CV-4381 (DLI)(CLP), 2017 WL 9482107, at *6 (E.D.N.Y. Feb. 24, 2017), *R&R adopted in relevant part*, 2017 WL 4410807 (E.D.N.Y. Sept. 30, 2017). Plaintiff had worked successfully in restaurants for different employers before being hired by Defendant. (Decl. at ¶ 4.)

### 3.    Adverse Employment Action

"[A] plaintiff suffers an adverse employment action if she endures a materially adverse change in the terms and conditions of her employment, such as 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities,' 'a disproportionately heavy workload,' or 'other indices unique to a particular situation.'" *Winslow v. Pulaski Acad.*, 448 F. Supp. 3d 197, 207 (N.D.N.Y. 2020) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)). For an action to qualify as an "adverse employment action," it "must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Vega*, 801 F.3d at 85).

Plaintiff alleges that she suffered adverse employment actions on three occasions: (1) when she was removed from Defendant's work schedule on September 28, 2019; (2) when her hours were reduced in October and December 2019; and (3) when she was either constructively terminated or effectively discharged in March 2020.

Bautista's removal of Plaintiff from the work schedule on September 28, 2019 and refusal to add her back constituted a termination, and was, therefore, an adverse employment action. *Feingold v. N.Y.*, 366 F.3d 138, 152 (2d Cir. 2004) ("Examples of materially adverse employment actions include termination of employment . . . ." (internal quotations omitted)).

Plaintiff also suffered an adverse employment action when her work hours were reduced in October 2019 and again in December 2019. (Compl. ¶¶ 44.) *See Little v. Nat'l Board. Co.*, 210 F. Supp.

2d 330, 381 (S.D.N.Y. 2002) (finding that a reduction in plaintiff's work assignments constituted an adverse employment action because the reduction resulted in a loss to plaintiff's income).

I find, however, that Plaintiff did not suffer an adverse employment action in March 2020 at the end of her employment because she does not allege sufficient facts to support that she was constructively discharged or effectively terminated at that time.

Constructive discharge "can be regarded as an aggravated case of . . . hostile work environment." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-47 (2004); *see also Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (the standard for establishing constructive discharge stemming from a hostile work environment "is higher than the standard for establishing a hostile work environment" alone). "A claim for hostile work environment requires the plaintiff to show discriminatory conduct that was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment. A plaintiff's further claim for constructive discharge requires the plaintiff to prove that her employer deliberately and discriminatorily created work conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Ferraro v. Kellwood Co*, 440 F.3d 96, 100–01 (2d Cir. 2006) (citations and quotations omitted). "[C]onstructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer." *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993). "Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Id.*

Plaintiff states that she "felt compelled" not to return to work "given how hostile her work environment had been." (Decl. ¶ 59.) However, the hostile work environment Plaintiff describes consisted of two inappropriate and insulting comments that Bautista made to and about her in September 2019 and one further comment in December 2019, when Bautista told Plaintiff "you're so

slow." These were not the "continuous or concerted" incidents necessary to establish a hostile working environment, *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1190 (2d Cir. 1987), let alone working conditions that were "so intolerable" that a reasonable person would have felt compelled to resign.

Moreover, when asked if she wanted to go back to work after giving birth, Plaintiff testified that she did, and that she attempted to obtain information about returning to work for Defendant. (Herrera Tr. 205:3-6.) Plaintiff's stated desire to return to work directly contradicts her argument that she resigned because Defendant created intolerable working conditions.

Regarding her allegations of effective termination, Plaintiff testified that she "reached out" to Defendant to try to get information regarding what she should do to return to work. (*Id.* at 205:5-206:7.) When she did not hear back from Defendant, Plaintiff assumed that she had been terminated. (*Id.* at 208:15-19.) These allegations are not sufficient for the Court to find that Plaintiff was terminated. *See, e.g.*, *Hamilton v. N.Y.S. Off. of State Comptroller*, 23-CV-0577 (TJM)(CFH), 2023 WL 6784434, at *10 (N.D.N.Y. Oct. 13, 2023), *R&R adopted sub nom.*, 2024 WL 686923 (N.D.N.Y. Feb. 20, 2024) (the court could not determine that plaintiff had been discharged after taking medical leave where plaintiff alleged only that she "called [defendant] to discuss her return to work . . . but did not hear back").

### 4.    Inference of Discrimination

The fourth prong requires "either that plaintiff's position was filled by a non-pregnant employee or that plaintiff's discharge occurred under circumstances giving rise to an inference of discrimination." *Hill v. Dale Elecs. Corp.*, No. 3-CV-5907 (MBM), 2004 WL 2937832, at *3 (S.D.N.Y. Dec. 19, 2004). Temporal proximity between a plaintiff's announcement of her pregnancy and her effective termination may warrant an inference of discrimination. *Briggs*, 819 F. Supp. 2d at 128. A "strong" temporal correlation alone may be sufficient to infer discrimination; otherwise, additional circumstantial evidence is required. *Pellegrino v. Cnty. of Orange*, 313 F. Supp. 2d 303, 317 (S.D.N.Y.

2004) (a four-month temporal gap is "weak" temporal correlation). There is no bright-line test for how close in time an adverse action must be to a protected activity, but courts have found as little as a three-month gap insufficient to infer discrimination. *Rinsler v. Sony Pictures Ent., Inc.*, No. 2-CV-4096 (SAS), 2003 WL 22015434, at *6 (S.D.N.Y. Aug. 25, 2003). A gap of less than a month is generally sufficient. *See id.* at *6 n.25 (collecting cases). In addition, "a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group []is a recognized method of raising an inference of discrimination for the purpose[] of making out a *prima facie* case." *Abdul-Hakeem v. Parkinson*, 523 F. Appx 19, 20–21 (2d Cir. 2013) (citation to summary order) (quoting *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010)).

Here, Plaintiff's allegations support an inference of discrimination with regard to her removal from the work schedule in September and reduced hours in October. Plaintiff was removed from the work schedule approximately two weeks after disclosing her pregnancy to her supervisor. (Compl. ¶ 23.) Moreover, she was placed back on the schedule with reduced hours approximately two weeks thereafter. There is, therefore, strong temporal proximity. *See e.g., Hill*, 2004 WL 2937832, at *3 (three weeks between plaintiff's announcement of her pregnancy and her firing was sufficient to sustain an inference of discrimination); *Flores v. Buy Buy Baby, Inc.*, 118 F. Supp. 2d 425, 430–31 (S.D.N.Y. 2000) (inferring discrimination where termination occurred one month after pregnancy disclosure). In addition, Plaintiff was replaced by new hires that included non-pregnant employees. (Decl. ¶ 39.) *See Helmes v. S. Colonie Cent. Sch. Dist.*, 564 F. Supp. 2d 137, 148 (N.D.N.Y. 2008) (finding that plaintiff's showing "her position remained open and was ultimately filled by someone outside of the protected class" was "sufficient to satisfy the fourth element"); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995) (holding that plaintiff's allegation that her position was filled by non-pregnant women was sufficient to support a *prima facie* case of pregnancy discrimination). When Plaintiff's hours were decreased, these new hires were given more shifts than her. (Decl. ¶ 39.)

The further reduction in Plaintiff's hours in December 2019, however, did not occur in circumstances giving rise to an inference of discrimination. That occurred approximately three months after she disclosed her pregnancy and was not accompanied by any other indicia of discrimination.

Accordingly, I respectfully recommend that the Motion be granted with respect to Plaintiff's Title VII and NYSHRL discrimination claims for her removal from the work schedule and for her reduction in hours in October 2019 after she was re-hired.

### B.    NYCHRL

Courts analyze NYCHRL discrimination claims under the *McDonnell Douglas* framework, as with NYSHRL and Title VII claims, but the NYCHRL standard is easier for a plaintiff to meet. Since Plaintiff has adequately established her discrimination claim under the NYSHRL, and since the NYCHRL framework is the same but the threshold is lower, Plaintiff has also established a claim under the NYCHRL. *See, e.g.*, *Winston v. Verizon Servs. Corp.*, 633 F. Supp. 2d 42, 48 (S.D.N.Y. 2009) ("[I]f a plaintiff successfully states a claim under the NYSHRL, then '[a] fortiori' she has stated a claim under the NYCHRL." (alteration in original) (quoting *Brightman v. Prison Health Servs. Inc.*, 878 N.Y.S.2d 357, 358) (2009)); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68 (E.D.N.Y. 2020) (holding the same).

## IV.    Retaliation

Plaintiff seeks default judgment for retaliation under Title VII (Claim II), the NYSHRL (Claim IV), and the NYCHRL (Claim VI).

### A.    Title VII and the NYSHRL

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a

13

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Similarly, the NYSHRL provides that it shall be an unlawful discriminatory practice "[f]or any employer . . . to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(1)(e). "[T]he standard for evaluating retaliation claims are identical under Title VII and the NYSHRL." *Setty v. Synergy Fitness*, No. 17-CV-6504 (NGG)(SMG), 2018 WL 8415414, at *9 (E.D.N.Y. Dec. 18, 2018), *R&R adopted*, 2019 WL 1292431 (E.D.N.Y. Mar. 21, 2019) (quoting *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 454 (E.D.N.Y. 2013)).

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006)).

### 1.    Participation in Protected Activity

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coch Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000), *superseded on other grounds by* N.Y.C. Loc. L. No. 85. "Informal complaints to supervisors, instituting litigation, or filing a formal complaint are protected activities under Title VII." *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) (citations and internal quotations omitted); *see Tang v. Glocap Search LLC*, No. 14-CV-1108 (JMF), 2015 WL 5472929, at *2 (S.D.N.Y. Sept. 16, 2015) ("There is no dispute that an employee's complaint about pregnancy discrimination—whether formal or informal—can constitute protected activity"). "For a complaint to qualify, however, the employee must also show that she had 'a good faith, reasonable belief that the underlying challenged actions of the employer

violated the law.'" *Id.* (quoting *Fattoruso v. Hilton Grand Vacations Co.*, 873 F. Supp. 2d 569, 581 (S.D.N.Y. 2012)).  Furthermore, any complaints "must make clear to the employer that the employee believes she is being discriminated against on the basis of a protected trait." *Ingrassia*, 130 F. Supp. 3d at 723.

Here, Plaintiff complained to Tricouros and Kramer that she was subjected to pregnancy discrimination; her complaint was based on a good-faith, reasonable belief that Defendant's actions were in violation of the law.  (*See* Compl. ¶¶ 32, 33, 35, 40.)  Additionally, Plaintiff complained to Bautista on December 3, 2019 about her hours being unfairly reduced.  (Decl. ¶ 48.)  Therefore, Plaintiff participated in protected activities under Title VII and the NYSHRL.

Although Plaintiff also alleges that her termination in September 2019 was retaliatory (Mem. at 19), she did not complain about Bautista's conduct before then.  Therefore, Plaintiff did not engage in a protected activity before she was terminated in September 2019.

2.    Employer's Awareness of Protected Activity

"While it is unnecessary for an individual to specifically invoke the word discrimination when complaining in order to alert her employer to her protected activity, there must be some basis to conclude that the employer was aware that the plaintiff engaged in protected activity." *Lucio v. N.Y.C. Dep't of Educ.*, 575 F. Appx 3, 6 (2d Cir. 2014).

Plaintiff has sufficiently alleged that Defendant had notice of her complaint.  She told Tricouros, who was an area manager, and Kramer, a human resources representative, about Bautista's discriminatory conduct.  Bautista was also present when Plaintiff complained to Tricouros, and Tricouros told Bautista to put Plaintiff back on the work schedule.  *See id.; Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (plaintiff's complaint to an officer of a defendant corporation about discriminatory conduct was sufficient to impute awareness of plaintiff's protected activity to the defendant).  In addition, Plaintiff complained directly to her supervisor Bautista in December 2019

15

about the discriminatory reduction in her hours.  *See U.S. ex rel. Ellis v. Sheikh*, 583 F. Supp. 2d 434, 440 (W.D.N.Y. 2008) (plaintiff notifying supervisor that she intended to report fraudulent behavior was sufficient to impute awareness of her protected activity to defendants).

            3.       <u>Adverse Employment Action</u>

In the context of a retaliation claim, an "adverse employment action" is one that is "likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42–43 (2d Cir. 2019) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Plaintiff alleges that after she complained about Bautista's treatment of her to Tricouros and Kramer, she was rehired in October 2019, but with reduced hours, and her hours were reduced again in December 2019 after she complained to Bautista.  The October 2019 and December 2019 reductions in Plaintiff's work hours constituted adverse employment actions.  *See Mendelsohn v. Univ. Hosp.*, 178 F. Supp. 2d 323, 330 (E.D.N.Y. 2002) (finding that a "reduction in [plaintiff]'s teaching duties constitute[d] a significant diminishment in plaintiff's material responsibilities so that he has alleged an adverse employment action" for the purpose of a retaliation claim).

As discussed above, I find that the end of Plaintiff's employment in March 2020 did not constitute an adverse employment action because Plaintiff was neither effectively terminated nor constructively discharged.

            4.       <u>Causal Connection</u>

"[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  "'Mere temporal proximity between a plaintiff's protected

activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a *prima facie* case.'" *Brown v. Montefiore Med. Ctr.*, No. 18-CV-3861 (PGG)(KHP), 2023 WL 4763832 (S.D.N.Y. July 25, 2023) (quoting *Aka v. Jacob K. Javits Convention Ctr. Of N.Y.*, No. 9-CV-8195 (FM), 2011 WL 4549610, at *9 (S.D.N.Y. Sept. 30, 2011)).

Plaintiff successfully establishes causation through temporal proximity for the reductions in her work hours in October and December. Plaintiff's complaints about Bautista's actions towards her, first to Tricorous on October 2, 2019 and then to Kramer on October 3, 2019, were followed by her reinstatement with reduced work hours on October 11, 2019. (Compl. ¶¶ 31, 33, 43, 44.) The time between these events was less than two weeks. Plaintiff's complaint to Bautista regarding her work hours on December 3, 2019 was followed by another reduction in her hours less than two weeks later, on approximately December 12, 2019. (Decl. ¶¶ 48-49.) Thus, Plaintiff meets her burden under the fourth prong of the retaliation analysis. *See Ruhling*, 2007 WL 28283, at *23 (finding causation where plaintiff was suspended within three weeks of having a conversation with defendant's human resources officer); *Ashok v. Barnhart*, 289 F. Supp. 2d 305, 315 (E.D.N.Y. 2003) (finding that a two-month interval between plaintiff's participation in protected activity and adverse employment action "may permit a reasonable jury to find the acts to be temporally proximate and causally related").

## B. NYCHRL

Since Plaintiff's retaliation allegations meet the higher pleading thresholds set under Title VII and the NYSHRL, Plaintiff's claim also meets the NYCHRL requirements. *See Hagan v. City of N.Y.*, 39 F. Supp. 3d 481, 503 (S.D.N.Y. 2014) ("[T]he city law grants employees broader protections than its federal and state counterparts"); *Antoine*, 489 F. Supp. 3d at 87 (the elements of an NYCHRL retaliation claim were automatically satisfied where plaintiff had successfully established Title VII and NYSHRL retaliation claims).

## V.    Damages

### A.    Back Pay

Violations of Title VII, the NYSHRL, and the NYCHRL "entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering." *Moore v. Houlihan's Restaurant, Inc.* No. 7-CV-3129 (ENV)(RER), 2011 WL 2470023, at *4 (E.D.N.Y. May 10, 2011). "The purpose of back pay [for an NYSHRL claim] is to make a person whole and redress the economic injury that has resulted from unlawful employment discrimination." *N.Y.S. Off. Of Mental Health v. N.Y.S. Div. of Hum. Rts.*, 861 N.Y.S.2d 223, 226 (N.Y. App. Div. 2008) (citations omitted). "The award should consist of lost salary, including anticipated raises, and fringe benefits" suffered "as a result" of a defendant's discrimination. *Id.*

Plaintiff requests back pay for the period she was removed from Defendant's work schedule from September 28, 2019 until she was rehired on October 11, 2019. (*Id.* at 20-21.) She also requests back pay for her reduced hours from when she was rehired to the end of her employment in March 2020. (Aff. at ¶¶ 38-40.) Finally, she requests back pay from March 2020 due to her constructive discharge or effective termination. (Mem. at 21.) Plaintiff states she was paid $15 per hour and made an average of $796.27 per bi-weekly pay period before Defendant's adverse employment actions occurred. (Aff. ¶¶ 2, 35.)

For the reasons discussed above, the end of Plaintiff's employment in March 2020 did not constitute an adverse employment action. Therefore, Plaintiff is not entitled to back pay from March 2020.

For the period from her termination on September 28, 2019 to October 11, 2019, when she was rehired by Defendant and worked her next shift, Plaintiff is entitled to back pay. *See Clarke v. Frank*, 960 F.2d 1146, 1151 (2d Cir. 1992) ("An employee is generally entitled to back pay from the

date of his wrongful termination to the date the discrimination is rectified"). This equates to approximately one bi-weekly pay period. Accordingly, Plaintiff's back pay for this period is $796.27 .

Plaintiff is also entitled to recover back pay for her reduction in hours from when she returned to work on October 11, 2019 until March 8, 2020, the date she stopped working for Defendant. This equates to approximately eleven bi-weekly pay periods. Plaintiff provides calculations that during this time, she incurred an average loss of $476.34 per bi-weekly pay period. (*Id.* ¶ 36.) Accordingly, Plaintiff's back pay for this period totals $5,239.74. (*Id.* ¶ 38.)

I, therefore, respectfully recommend that Plaintiff be awarded a total of $6,036.01 in back pay.

**B.    *Emotional Distress Damages***

Plaintiff requests an award of "significant emotional distress damages" of "at least six figures." (Mem. at 21–22.)

A prevailing plaintiff in an employment discrimination case may recover emotional distress damages under Title VII, the NYSHRL, and the NYCHRL. *See Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001) (holding that victims of intentional discrimination under Title VII may recover compensatory damages if they "prove that the discrimination caused them 'emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, [or] other nonpecuniary losses'" (quoting 42 U.S.C. § 1981(a)(b)(3))).

Courts in the Second Circuit generally categorize emotional distress damages as "garden-variety," "significant," or "egregious." *See Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 126 (2d Cir. 2024); *Antoine*, 489 F. Supp. 3d at 96-97. "Garden variety" claims are often ones for which a plaintiff "did not seek medical treatment," while "significant" claims are "usually evidenced through medical testimony or documentation," and "egregious" cases are ones "where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected." *Antoine*, 489 F. Supp. 3d at 96-97. Claims categorized as significant are also "based on more substantial harm

or more offensive conduct" than garden variety claims. *Qorrolli*, 124 F.4th at 126 (citing *United States v. Asare*, 476 F. Supp. 3d 20, 37 n.2 (S.D.N.Y. 2020)).  Damages for garden variety distress generally merit awards ranging from $30,000 to $125,000, while significant emotional distress generally supports damages awards ranging from $50,000 to $200,000.  *Emamian v. Rockefeller University*, No. 7-CV-3919, 2018 WL 2849700, at *16 (S.D.N.Y. June 8, 2018) (stating this range and collecting cases); *see also Qorrolli*, 124 F.4th at 126.

Courts in this District recognize that emotional distress damages should be adjusted for inflation using the Bureau of Labor Statistics' Consumer Price Index ("CPI") inflation calculator. *Gordon v. APS Contractors Inc.*, No. 21-CV-259 (WFK)(JRC), 2024 WL 4029520, at *10, *10 n.12 (E.D.N.Y. Feb. 20, 2024); *R&R adopted*, 2024 WL 4028470 (E.D.N.Y. Sept. 3, 2024); *Antoine*, 489 F. Supp. 3d at 97 (calculating inflation from September 2005, the date of the earliest case found for the range cited, to August 2020); *see* CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (last visited Mar. 3, 2025).

Plaintiff has established more than "garden variety" emotional distress.  She described the effect of Bautista's verbal harassment on her mental health, including that the stress "made [her] catch an anxiety attack." (Herrera Tr. at 184:8-22.)  Plaintiff provided medical documentation showing that in November 2019, she was hospitalized for five days for a panic attack and suicidal thoughts as well as pregnancy-related symptoms and that she was prescribed sertraline for major depressive disorder. (Dkt. 33-10.)  *See Ruhling v. Newsday, Inc.*, No. 4-CV-2430 (ARL), 2008 WL 2065811, at *7 (E.D.N.Y. May 13, 2008) (work-related stress partially contributing to symptoms provides grounds to award emotional distress damages).  The alleged emotional distress Plaintiff suffered is, therefore, categorized as significant.

Plaintiff's allegations, however, merit an award at the low end of the "significant" range. *See, e.g.*, *Rainone*, 388 F. Supp. 2d at 126 (reducing an award for emotional distress to the "low end of

the 'significant' range" when there was "no evidence of physical manifestations of emotional distress or debilitating alterations in lifestyle, and no evidence of permanency"). Aside from her hospitalization and medication, Plaintiff provides no evidence that she required ongoing medical or mental health treatment stemming from her work conditions, nor does she allege lasting physical or psychological effects.

Applying the CPI calculator from March 2019, when *Emamian* was decided, in the same manner as the court in *Gordon* and *Antoine*, as of January 2025, the low end of the significant emotional distress range is approximately $63,000. Accordingly, I recommend that the Court award Plaintiff $63,000 in emotional distress damages.

### C.    Punitive Damages

Plaintiff seeks a "significant" punitive damages award "due to Defendant's openly discriminatory employment practices." (Mem. at 25.)

Punitive damages are not available under the NYSHRL. *See, e.g.*, *Becerril*, 2009 WL 2611950, at *6.

Under Title VII, "[p]unitive damages are limited . . . to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 101 (2d Cir. 2001) (brackets in original) (also noting that the same standard applies to the NYCHRL). "Malice and reckless indifference refer to 'the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'" *Id.* The requisite state of mind for malice or reckless indifference may be inferred from "egregious or outrageous" acts, but such acts are not a prerequisite for malice or indifference. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538 (1999).

Plaintiff argues that Defendant was aware that Bautista's conduct violated federal law, but nonetheless permitted her to discriminate against Plaintiff. (Mem. at 26.) Plaintiff's allegations show,

however, that soon after Plaintiff complained of Bautista's discriminatory conduct, Defendant took action by ordering that Plaintiff be put back on the work schedule.  Plaintiff does not allege that Defendant was aware that Bautista then reduced her hours.

Moreover, Defendant had a written policy against discrimination, which helps to dispel any claim about the employer's "reckless" or "malicious" state of mind.  *See, e.g.*, (Ex. J to Mem., Dkt. 39-10 at 13-15 (Defendant's policy against discrimination)); *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 983 (4th Cir. 1997) (noting that "[i]n some cases, the existence of a written policy instituted in good faith has operated as a total bar to employer liability for punitive damages"); *Kolstad*, 527 U.S. at 544 (citing *Harris* approvingly).

Accordingly, I respectfully recommend that Plaintiff not be awarded punitive damages.

### D.    Pre-Judgment Interest

Plaintiff seeks pre-judgment interest on her back pay award at the rate of the average annual United States "T-Bill" rate of interest, or the average rate of return on one-year United States Treasury bills, through the date of entry of judgment in this matter.  Courts in this Circuit have held that "it is ordinarily an abuse of discretion *not* to include pre-judgment interest in a back-pay award . . . ." *Clarke v. Frank*, 960 F.2d 1146, 1154 (2d Cir. 1992) (emphasis in original) (quoting *Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55, 58 (2d Cir. 1984)).  "The award of prejudgment interest should be calculated from the time the claim arises through the date of judgment." *Joseph v. HDMJ Rest. Inc.*, 970 F. Supp. 2d 131, 151 (E.D.N.Y. 2013).

"[I]n cases where the judgment is based on violations of both state and federal law, it is common practice in the Second Circuit to apply the federal interest rate pursuant to 28 U.S.C. § 1961(a)." *Cioffi v. New York Cmty. Bank*, 465 F. Supp. 2d 202, 222 (E.D.N.Y. 2006) (quoting *Collins v. Suffolk Cnty. Police Dep't*, 349 F. Supp. 2d 559, 565 (E.D.N.Y. 2004) (vacated on other grounds); *see, e.g., Joseph v. HDMJ Rest., Inc.*, 970 F. Supp. 2d 131, 151 (E.D.N.Y. 2013) ("Courts traditionally use

the average Treasury bill rate [specified in 28 U.S.C. § 1961(a)] over the time period in question for back pay compensation"); *Mohan v. La Rue Distributors, Inc.*, 06-CV-0621 (FB)(RLM), 2008 WL 4822266, at *4 (E.D.N.Y. Oct. 27, 2008) (holding the same and noting that backpay is generally calculated according to the annual rather than weekly rate of return on Treasury bills); *Luciano v. Olsten Corp.*, 912 F. Supp. 663, 677 (E.D.N.Y. 1996), *aff'd*, 110 F.3d 210 (2d Cir. 1997) (holding the same). Interest on this amount is compounded annually. *See, e.g.*, *Barrella v. Vill. of Freeport*, 43 F. Supp. 3d 136, 194 (E.D.N.Y. 2014), *aff'd*, 814 F.3d 594 (2d Cir. 2016).

Plaintiff requests pre-judgment interest from March 31, 2020 onwards. (Mem. at 26.) Plaintiff's claims had arisen by this date. I, therefore, recommend that Plaintiff be awarded pre-judgment interest on her back pay award from March 31, 2020 though the date of judgment in this matter, as calculated by the Clerk of Court by applying the average annual United States Treasury bill rate of interest referred to in to 28 U.S.C. § 1961(a) from 2020 to 2025, then annually compounding interest. *See, e.g.*, *Barrella*, 43 F. Supp. 3d at 194 (directing the Clerk to calculate prejudgment interest); *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 230 (E.D.N.Y. 2018) (taking the same approach).

### E.    *Post-Judgment Interest*

Post-judgment interest is mandatory. *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004); *see* 28 U.S.C. § 1961(a) (post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court" and "shall be calculated from the date of the entry of the judgment at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of judgment"). Accordingly, I recommend that Plaintiff be granted post-judgment interest, to be calculated from the date the Clerk of Court enters judgment in this action until the date of payment, at the rate set forth in 28 U.S.C. § 1961.

## VI.    Attorneys' Fees and Costs

Plaintiff requests $116,195.00 in attorneys' fees and $5,153.95 in costs.  (Mem. at 27.)

A plaintiff who has prevailed under Title VII and the NYCHRL is entitled to recover reasonable attorneys' fees and costs.  42 U.S.C. § 2000e-5(k); N.Y.C. Admin. Code § 8-502(g).  "Since the Title VII and NYCHRL provisions are substantively and textually similar . . . the reasonableness of fees [are] analyzed the same regardless of which provision provides [plaintiff's] recovery." *Antoine*, 489 F. Supp. 3d at 103 (quotation omitted).

### A.    *Attorneys' Fees*

District courts have broad discretion to determine the amount of attorneys' fees awarded, and the party requesting fees must submit documentation to support its request.  *Mahoney v. Amekk Corp.*, No. 14-CV-4131 (ENV)(VMS), 2016 WL 6585810, at *18 (E.D.N.Y. Sept. 30, 2016), *R&R adopted*, 2016 WL 6601445 (E.D.N.Y. Nov. 7, 2016).  "[T]he lodestar [method]—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'"  *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. Of Albany & Albany Cty. Bd. Of Elections*, 522 F.3d 182, 183 (2d Cir. 2008)).

Courts determine what constitutes a reasonable hourly rate through application of "the forum rule," which states that "courts should generally use the hourly rates employed in the district in which the reviewing court sits . . . ."  *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quotations and citation omitted).  "If the Court finds that some of the time [the attorney billed] was not reasonably necessary[,] it should reduce the time for which compensation is awarded accordingly." *Mister Softee, Inc. v. Konstantakakos*, No. 15-CV-4770 (SJ)(SMG), 2016 WL 11445964, at *6 (E.D.N.Y. June 27, 2016), *R&R adopted*, 2016 WL 4250314 (E.D.N.Y. Aug. 11, 2016) (quotation and citation omitted).  "Where time entries are vague, duplicative, or otherwise inadequate, a court may make 'an

24

across-the-board reduction, or percentage cut, in the amount of hours.'" *Id.* (quoting *T.S. Haulers, Inc. v. Cardinale*, No. 09-CV-0451 (SJF)(ARL), 2011 WL 344759, at *3 (E.D.N.Y. Jan. 31, 2011)).

### 1.    <u>Reasonable Hourly Rate</u>

Plaintiff requests attorneys' fees for work performed between 2019 and 2023 by Brittany Stevens ("Stevens"), Morgan Mickelsen ("Mickelsen"), Katerina Housos ("Housos"), Daniela Mendes ("Mendes"), Blake Ferris ("Ferris"), Shaina Wood ("Wood"), Janelle Romero ("Romero"), Sally Pak ("Pak"), Gemma Sunnergren ("Sunnergren"), Jessica Reid ("Reid"), and Vivian Wei ("Wei"). (Mem. at 28–32; Counsel's Declaration ¶ 26.)

Stevens is a partner at Phillips & Associates and has been practicing law since 2014.  (Mem. at 29.)  Stevens requests a rate of $550.00 per hour for her work on this case.  (*Id.*)  Housos, Mickelsen, Mendes, Wood, Romero, and Ferris worked on this case as associates at Phillips & Associates and have been admitted to practice law since 2016, 2018, 2018, 2018, 2020, and 2023, respectively.  Each of these associates requests a rate of $400.00.  (*Id.* at 29-31.)  Pak, Sunnergren, Reid, and Wei are paralegals at Phillips & Associates; they each request a rate of $150.00.  (*Id.* at 31-32; Dkt. 39-13 ¶ 27.)

In this District, a reasonable hourly rate is determined by looking at prevailing rates in this District for "lawyers of reasonably comparable skill, experience, and reputation."  *Linde v. Arab Bank, PLC*, No. 04-CV-2799 (BMC)(PK), 2023 WL 9232942, at *6 (E.D.N.Y. Nov. 28, 2023) (quoting *Larsen v. JBC Legal Grp., P.C.*, 588 F. Supp. 2d 360, 363 (E.D.N.Y. 2008), *as amended* (Dec. 18, 2008)).  There is a rebuttable presumption that a client would hire counsel at rates consistent with the prevailing in-District rate.  *Linde*, 2023 WL 9232942 at *6 (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008).

This Court has recently reviewed hourly rates for attorneys practicing in the Eastern District of New York and applied inflation-adjusted rates of $450-$650 for partners, $300-$450 for senior

associates, $150-$300 for junior associates, and $100-$150 for paralegals. *Rubin v. HSBC Bank USA, NA*, No. 20-CV-4566, 2025 WL 248253, at *6 (E.D.N.Y. Jan. 21, 2025).

I respectfully recommend awarding $450 per hour to Stevens, appropriate for a partner who has been practicing law for approximately ten years. I respectfully recommend awarding $300 an hour to Housos based on her approximately five to seven years of experience when she billed her hours; $250 an hour to Mickelsen, Mendes, and Wood, who had approximately three to five years of experience; $175 an hour to Romero, who had approximately one to three years of experience; and $150 an hour to Ferris, who graduated law school in 2022 and was admitted to the bar in 2023.

I respectfully recommend applying a rate of $150 per hour to work done by Reid. Although Reid was doing paralegal work, she is a law school graduate who previously practiced employment law as an associate attorney. (*See* Mem. at 32.) I respectfully recommend awarding $115 per hour to Sunnergren and Wei. (*See id.* at 31-32.) Pak's credentials have not been provided, so I respectfully recommend that she be awarded $100 per hour. *See, e.g., Martinez v. New 168 Supermarket LLC*, 19-CV-4526 (CBA)(SMG), 2020 WL 5260579, at *9 (E.D.N.Y. Aug. 19, 2020), *R&R adopted*, 2020 WL 5259056 (E.D.N.Y. Sept. 3, 2020) (awarding a reduced rate where counsel provided paralegals' names but not background information).

## 2. **Hours Documented**

"[T]o determine whether the number of hours spent by Plaintiff's counsel was reasonable, the Court must 'use [its] experience with the case, as well as [its] experience with the practice of law, to assess the reasonableness of the hours spent . . . in a given case.'" *Litkofsky v. P & L Acquisitions, LLC*, No. CV 15-5429 (DRH)(AKT), 2016 WL 7167955, at *10 (E.D.N.Y. Aug. 19, 2016), *R&R adopted*, 2016 WL 7168069 (E.D.N.Y. Dec. 8, 2016) (quoting *Fox Indus., Inc. v. Gurovich*, No. 03-CV-5166 (TCP)(WDW), 2005 WL 2305002, at *2 (E.D.N.Y. Sept. 21, 2005). District courts may "exclude

excessive, redundant or otherwise unnecessary hours." *Quarantino v. Tiffany & Co.,* 166 F.3d 422, 425 (2d Cir. 1999).

Plaintiff submitted contemporaneous timesheets showing 327.3 combined hours of work performed in this case from October 21, 2019 to December 21, 2023. (Dkt. 39-12.)

The hours billed by counsel for Plaintiff are reasonable. Each individual entry devotes an appropriate amount of time towards completing the corresponding task. Additionally, the total hours billed are not excessive given that the parties completed discovery, including depositions, and the case was ready for trial before Defendant's default. (*See* December 21, 2022 docket entry); *cf., e.g., Townsend v. Benjamin Enterprises, Inc.*, No. 5-CV-9378 (GAY), 2009 WL 8758822, at *7 (S.D.N.Y. Oct. 2, 2009), *aff'd*, 679 F.3d 41 (2d Cir. 2012) (awarding just under 500 hours billed to a legal team after a five-day trial despite reducing hours for improper requests and for poor timekeeping practices).

Accordingly, I respectfully recommend that Plaintiff be awarded $91,353.50 in attorneys' fees, calculated in accordance with the following table:

| Attorney/Paralegal | Applicable Rate | Hours Worked | Fee |
|---|---|---|---|
| Stevens | $450 | 94 | $42,300.00 |
| Housos | $300 | 16.9 | $5,070.00 |
| Mickelson | $250 | 95.2 | $23,800.00 |
| Mendes | $250 | 17.9 | $4,475.00 |
| Wood | $250 | 2.5 | $625.00 |
| Romero | $175 | 35.3 | $6,177.50 |
| Ferris | $150 | 19 | $2,850.00 |
| Sunnergren | $115 | 0.9 | $103.50 |
| Reid | $150 | 20.8 | $3,120.00 |
| Wei | $115 | 23.5 | $2,702.50 |
| Pak | $100 | 1.3 | $130.00 |
| | | **TOTAL:** | **$91,353.50** |

## B.    Costs

Plaintiff requests costs, consisting of the filing fee of $400.00, $689.74 for process server charges in effectuating service upon Defendant and a FedEx charge associated with sending a copy of the draft complaint and claim letter on May 31, 2022, $476.38 for Plaintiff's medical records, and

$3,564.83 for deposition transcripts.  (Dkt. 39-13 ¶ 28.)  Plaintiff additionally provides documentation of $23.00 in postage fees incurred in this matter.  (Dkt. 39-14.)

"Costs relating to filing fees, process servers, postage, and photocopying are ordinarily recoverable." *Hernandez v. Delta Deli Market Inc.,* No. 18-CV-00375 (ARR)(RER), 2019 WL 643735, at *10 (E.D.N.Y. Feb. 12, 2019) (quoting *Teamsters Local 814 Welfare Fund v. Dahill Moving & Storage Co.*, 545 F. Supp. 2d 260, 269 (E.D.N.Y. 2008)).  "Transcript expenses are routinely recoverable as litigation costs."  *Hughes v. City of New York*, 18-CV-9380 (MKV), 2022 WL 3919637, at *4 (S.D.N.Y. Aug. 31, 2022).

Plaintiff has provided adequate documentation of the requested costs.  (Dkt. 39-14.) I therefore respectfully recommend awarding Plaintiff $5,153.95 in costs.

## CONCLUSION

Based on the foregoing and as set forth above, I respectfully recommend that the Motion be granted in part and that Plaintiff be awarded damages as follows:

1. Back pay in the amount of $6,036.01, together with pre-judgment interest;

2. $63,000.00 in emotional distress damages;

3. $91,353.50 in attorneys' fees;

4. $5,153.95 in costs; and

5. Post-judgment interest.

I respectfully recommend that Plaintiff's request for punitive damages be denied.

Any written objections to this Report and Recommendation must be filed within 14 days of service of this report.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file objections within

the specified time waives the right to appeal any order or judgment entered based on this Report and

Recommendation.  *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO RECOMMENDED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:    Brooklyn, New York
          March 7, 2025